FILED
04 FEB -9 AM 10: 28
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

Vernell WOODS

Plaintiff,

vs. Case N. 8:02-CV-02302-T-27MB

PRICEWATERHOUSECOOPERS, INC.,

Defendant.

/

PLAINTIFF ARGUMENT TO DENY SUMMARY JUDGEMENT

A.

1. In August 1995 , I performed the Administrative Assistant and Event Coordinator task (for MITIS 3).

In 1996, I performed only the Event Coordinator duties.

In 1999 I handled 8 programs with no assistance. That is when I went to David Duhamel and Jackie Walters to obtained help.

I trained and supervised the workload for the assistant, Josette Clark. There was never a mentioned that this position was for my morale. I approached Jackie Walters, the Ombudsmen, and asked her the purpose for the Lead position and she stated to me that it would enable me for Management.

2. Plaintiff's Performance

All logistics templates were cleared by the Program manager.

In conference, my supervisor, Cindy Minetti, mention by strength and weaknesses, in which one was written communication. I set out from that time, 1997 perfecting my skills, taking many internal and external classes.

Later in my evaluation, Cindy Minetti, one of PwC' Director, mentioned the improvements I had made. (#1)

There was never mentioned to me in my entire 9 years at PwC that there were complaints from partners and HR managers that they do not understand the letters they received relating to the status of participants enrollment. I have comments on my communication with the participants.

If I was the type of person that became overwhelm, I would not have been able to facilitate 8 programs on my own. I also was able to grasp new processes. The statement stated in [Raimondo: 93: 97] was never mentioned to me. Only on the Summary Document have I seen this statement. (#2) (#5)

Andrea Raimondo had very little physical observation concerning myself since she resided in Philadelphia. Also, she only worked with me remotely approximate 6-7 months.

The statement regarding Glenda Thomas remarks that I did not complete certain tasks, or did not complete them properly is **FALSE**. I spoke once with Glenda Thomas over the phone. I did not work with her personally.

29

As Event Coordinator for Data Warehouse, I was responsible for the same program: (Intro to Data Warehousing, Data Warehousing Bootcamp, SAP Business, DW Advanced Methodology, and SAP SEM that my predecessor, Debbie Eichler had.

I also ran one more class than she did. She went from Data Warehousing to Managing the SPL (Self Pace Learning) within the department.

I received excellent praise from my program manager, Larry Gosselin, Director, for running the Data Warehouse program, which he was over. On July 26, 2001, I received the Road Runner Award by Amy Wright for providing excellent service while under the "bizarre-est" of situations. (#3)

Trish Sward, my supervisors from 1994-1995 attest to my superior skills and rank over Pam Craft. [Sward 53: (15-25) 54: (1-17)]

1

I was not the Event Coordinator for MITIS 1 (ASCENT). I was the Event Coordinator for MITIS 2, MITIS 3, ATG, BROADVISION, VIGNETTE, ARIBA, I2, Application Developer, programs. I only receive names from Lynn Forest, the Event Coordinator for MITIS 1 (ASCENT) to enroll them for one week in one of my classes.

These participants that came from Lynn Forest ASCENT program have been in training for approximate 2-3 months. The last week of their training, they would come to one of the Vendor's classes I was running. (#4)

Lynn took over my last class, which had approximate 7 participants. Her ASCENT program had decreased to 0 class recruitment, leaving Lynn with no ASCENT classes.

There was never anything mentioned from the Managers, nor Lynn Forest, that they had difficulties working with me. Only on the summary have I seen this statement. [Raimondo 30]

3.

I stated to Margie Lloyd that I was discriminate against. I also stated that this was an ongoing case of discriminatory abuses, beginning in 1992. I stated that I was discriminated in coming into PwC, promotion and salary.

In 1997 David Duhamel, director, transferred to our Learning and Development group.

He was assigned as Operations Manager for our division. Kathy Gibson was also hired shortly after to assist in the HR functions.

The statement that David Duhamel made stating to Margie Lloyd that he had no knowledge of any discriminatory practices concerning me is unfortunately not true. [Lloyd 29: (lines 24-25),30], Duhamel: [43: (lines 7-22)]

I begin to ask for meetings with David Duhamel beginning in March, 1997 regarding Sandra Kinsey discriminatory practices toward me. (#6)

In March, 1997 I met with David to discuss my employment, and how I was being treated by Kinsey. David researched my concerns and found that I had a legitimate cause.

In approximately August 1997, David Duhamel, Kathy Gibson, Sandra Kinsey and I met. Duhamel had researched my compensation, and work history. Kinsey made notes and went over the figures. She asked me if the figure $35,000 was acceptable to me, and I agreed. (#7,8)

After a couple of months went by and nothing occurred, I went to Duhamel and Gibson.

I took my papers and showed Duhamel the amount she had written. David went back to her and she stated that she could not remember doing that even though it was in her own handwriting.

In 1999 Kathy Gibson went in to see Sandra Kinsey to speak on my behalf. I later approach Gibson later that day and she was in tears. She stated that Sandra Kinsey had became upset with her for mentioning my situation to her. Gibson stated that she did not know what else that she could do for me.

Duhamel later went to Kinsey and there was an angry debate and nothing was done.

Sandra also put distance between David and herself; otherwise she excluded him from the business at hand. This was stated to me by David Duhamel.

After one of Duhamel meetings with Sandra Kinsey in 2000, over my situation again. She was very disrespectful to him.

David came to me and stated that since he could not make any headway and I rightly deserve what I had been confronting her that the money I owed on the American Express card is cancelled. He also stated that the Kinsey had acted in-appropriate with me and in the finances at PwC, and should be in jail for what she had done.

I had charged more on the corporate card and was having trouble paying it off.  I had told Duhamel about my dilemma. He gave me $7,500 in traveler checks and wrote out a payment plan agreement for me. I was paying as agreed when Duhamel made the above statement. (#9)

In September 2001, I told David Duhamel that I was seeking an attorney to go further into the discriminatory practices that I was encountering from Sandra Kinsey. He stated that "he did not blame me for doing so". I did consult an attorney on October 29, 2001 Mrs. Berns who informed me what to do. She stated that I should contact the EEOC first.(#10, 11)

Later on that month Mr. Duhamel came to me and stated to hold on. He stated that there was going to be a leadership change. He told me to keep it under my hat, that Sandra Kinsey was about to be removed and he was going to be the director.

Regarding the statement that I was not comfortable training, is **FALSE**. Training is one of my strongest point, and my work load was not as my peers—more managers to answer to, and more programs for one individual Event Coordinator. (#12)

I previously own Computer Institute in Fort Wayne IN. I have taught computer programming, software applications, conducted seminars in the US and Ghana Since 1988. (#13).

I have 10 years of supervisory experience; 5 years from the City of Fort Wayne Health Department, 3 years in my own business, and 2 years from Lighthouse Fellowship.

The statement that Andrea Raimondo made about my negative attitude and screaming is false.

I developed a relationship with many of the PricewaterhouseCoopers employees, and never have I acted as a negative nor , screaming person. I was a team player, and many of the employees came to me to listen to many of their difficulties that they were facing in their life. I believe I made a difference in their lives over these past 9

years. (#14)

Within the seven months that I was acquainted with Ms. Raimondo, I never lend myself to that type of demeanor.

4.     Reduction in Force

Andrew Breuer, a temporary employee, not a contractor, was hired in to facilitate my classes that was schedule to run from January through April, 2002.

Vonda Massingill called me, January 24, 2002, the day after I was laid off and stated that they wanted her to step right in my position, but she did not know what to do as an Event Coordinator.  I also checked with Jeff , the owner of the place where the Data Warehousing classes were being held, and he stated that Andrew Breuer was physical with them through out the term.

Karen Duvall was transferred in 2000 as Event Coordinator, but never had the opportunity to run a physical class.

I handled 8 programs all on my own with more responsibilities than most of the Event Coordinators.


B, C, D, E.

I first came to work for Price Waterhouse, now PricewaterhouseCoopers, now IBM, November, 1992-February, 1993, as a Temporary Employee through the Kelly Temporary Services.  I was assigned to work with Terry Magee, to convert text and graphics located within WordPerfect document files.

I sought out employment with Price Waterhouse, but was told that there were no job openings within that department. I later learned that there was another temporary employee, Diane Olpinski, working in the same department that was hired in.

In October 1993, I was hired in by Trish Sward as a contractor for Price Waterhouse working as a secretary and accounting clerk for Price Waterhouse. I was the only African American employed in this division know as the National Center, now LPDC (Learning Professional Development Center). Trish Sward was my supervisor.

I began as an Secretary and later transitioned to a Program Administrator, now referred to as Event Coordinator.  I was trained  by Jenia Messer, a contractor employee, which soon after became a full time employee, Graphic/Event Coordinator.

I began to set up appointments with Sandra Kinsey, the Learning and Professional Division Director, to obtain permanent status with the firm.

I met with Sandra Kinsey in March, May, and June 1994, prior to fiscal year end when promotions  and achievements are awarded.  She stated she was working on getting me in.  She stated that she had heard so many positive things about me with the work I had been performing for Kevin Young and Trish Sward.

In July 1994, I was notified that I was not put on permanent status, nor awarded the position as Program Administration, in which I was currently performing.

I met with Sandra in July and she stated that there were a number of allocations that she was confronted with and that was the reason I was not hired in at that time.  She stated that she was working her hardest to get me in.

During 1994, a temporary employee, Pam Craft, was assigned within my group to assist in the day-to-day operations.

It was later discovered that she did not have the skills necessary to perform the tasks that were assigned to her.  She was not knowledgeable of the computer software applications.  Jenia Messer, whom she was assigned to, was also aware of this, and declared to me that she was on welfare and had several children and badly needed to work.  Pam also confided in me, with tears, she did not know how to do the work that was given to her.

Within the next several months I trained Pam Craft how to use the computer and the software applications.  I had to complete the work given to her and continue to train her, working many overtime hours.

When one part of the division's program, SAP, was relocated to Philadelphia, Pam Craft was hired in as the Program Administrator position.  I was not offered that position.

I met with Ms Kinsey in November 1994 after Ms. Craft was put on permanent status and given the Program Administrator position.  She stated that she had not forgotten me and was continuing working toward bringing me on.

This was very disturbing, being the object of discrimination, yet not able to say too much or I would be out the door.

In August 1995, I was hired in as a clerical position, labor grade 90, which was the lowest grade within that division.  Even though I had worked as the Program Administrator, labor grade 73, I was not hired in as one. (#14)

In November 1995, Teri Ponsot was hired in as a Program Administrator. I asked Teri about her work history before coming to PW, and she stated that she was a secretary. The Price Waterhouse Bottom Line Newsletter, verified this statement.

I was on the printout that I was given when I was appointed to work with the fundraiser for the United Way that also verified her labor grade. (#15)

Her supervisor, Henry Lum, who is Sandra Kinsey's significant other and, father of her son.

Teri was also given one full-time employee and two temporary staff to assist her in her programs.

I asked for assistance for my workload, but was not given one until December, 2000. (#16)

Sandra Kinsey also brought into the department, Jeff Redfield, Director, friend, Cathy Warford and hired in one of our consultants', Sherman Brown fiancée, Andrea, as Program Administrator.  I help to train Andrea.

In 1996 I received a great review from Kevin Young, my supervisor and he had recommended that I be assigned the Program Administrator for the MITIS 3 program.  I was trained by Jenia Messer, which transferred to another Department

When I went to him and told him I was not given the Program Administrator position , he was very angry and stated that Sandra was breaking every EEOC rules.  He left the division soon after.  Young denies that he made that statement to me. (#17)

I have suffered discriminatory infliction along with emotional distress. from 1992-2002 from management of PwC.

The letter I sent to Amy Wright, PwC Partner, highlighted some part of what I had to endure.  (#18)

#1

Cindy Minetti
05/04/99 12:01 PM

To: Vernell Woods/MCS/Price Waterhouse@Price Waterhouse-US
cc:
Subject: Performance Evaluation October-April

Vernell, here's a draft of your performance evaluation. Read through it, and let's discuss this afternoon.

## Performance Evaluation
## NON-CONTRACT EXEMPT STAFF

**Fiscal Year 1999**

**For the Period - From: ______October, 1998______ To: ____April, 1999__________**

**Name: Vernell Woods** **Staff No:** **Job Title: MITIS 2 Course Administrator**
**Assigned Office: 691 - PDC** Work Office: Tampa-NAC
**Department #/Name: 200/MCS**
**Staff Class:**
**Date Engaged:** **Date started in present position: Vernell took over the M2 course in February, 1998.**
**Position held: Course Administrator for MITIS 2**
**Prepared By:** Cindy Minetti

***Indicate the complexity of this assignment in relation to the staff member's level of experience:***

Difficult
Normal
Easy

**If the assignment is other than normal, please indicate reasons:**

**Indicate your level of contact with your staff:**

This Form is designed to help you objectively evaluate performance. After completing the report, you will be expected to discuss the evaluation with the person you are evaluating prior to submitting the form to HR. Considering the complexity of this assignment and the individual's level of experience, place an X next to the appropriate number in each of the areas below to characterize performance in this assignment. Specific job-related commentary is necessary in all sections. The rating scale is as follows:

**(1) Exceptional** - The individual has demonstrated a superior level of capability versus the high caliber normally expected of individuals at that staff level.

**(2) Higher Than Expected** - The level of competency demonstrated by the individual is greater than the high caliber normally expected of individuals at that staff level.

**(3) Fully As Expected** - The level of competency demonstrated by the individual conforms to the high caliber expected of individuals at that staff level.

**(4) Less Than Expected** - The appropriate level of competency was not demonstrated by the individual in certain specified areas, and further development is required to attain the desired level of performance.

**(5) Unsatisfactory** - Deficiencies with respect to the level of competency exist to the extent that they may be difficult to overcome.

**N/A** - Not applicable or not observed.

**Ethics and Integrity**

Does this individual demonstrate a high level of ethics and integrity?

● YES
○ NO

If no, please explain:

Does this individual use discretion when dealing with confidential information?

If no, please explain:

**Comments:**

**Professional and Business Characteristics:**

Demonstrates knowledge of Firm business, policies, procedures

Prioritizes tasks appropriately according to client and Firm needs

Responds promptly to inquiries and messages

Responds to pressure - Effective even in stressful situations including competing priorities, tight deadlines and unexpected problems

Analyzes problems and provides practical solutions

Pursues alternate courses/resources as required to produce results

Learns new procedures and tasks

Completes projects and daily responsibilities in a timely manner

Demonstrates effective judgment

Works effectively in a team environment

Keeps supervisor informed (status of projects/tasks)

Produces results at a quality level (accuracy)

**Comments:**

During the last 6 months, Vernell has really developed an efficient manner of organizing and administering the classes. Vernell has done a good job of organizing her time, and tasks to complete things in a timely manner. She now has help with the breakdown/setup of the classroom, and that has helped ease her workload considerably. Vernell is very conscientious about ensuring that each class runs smoothly for both the participants and the instructors.

During this period, Vernell successfully dealt with the class as we moved around to several locations. We started out in Anchor Glass, then moved back to Lakepointe, then to the KDC for a couple of months, then finally over to the new facility at Mainsail Village beginning in March! Vernell managed the moving process, and ensured the accurate setup of all materials and setup, including verifying the technical environment. Vernell also ensured the participants were informed of the correct locations with a minimum of confusion.

Vernell is very proactive in determining what needs to be done and ensuring the course runs smoothly. Vernell has also does a good job of keeping me informed of issues and the status of the course. (This was a development need in a previous evaluation, which has been successfully met.)

**Communication Skills Written/Oral:**

Communicates effectively with work team/staff/client

Uses proper grammar in all written and oral communications

**Comments:**
Vernell is very service oriented and really wants to deliver quality service to instructors, participants and me. She is great at communicating with participants, ensuring that they have information and getting back to them with answers. During this period, we moved around a lot to various course locations and lodging locations. Vernell worked hard to ensure that the participants had the correct information. A suggestion that I would make to Vernell is to work on revising the pre-arrival information so that the lodging details are communicated separately, and closer to the course start date. This would minimize the number of communications the participants receive for changes and hopefully, reduce confusion and wrong information.

[illegible] of improvement in this ar

Vernell has improved in her written communications, especially in communications to those outside the department (participants and CE contacts). However, she still has some way to go. Vernell is scheduled to go to a course in grammar in June. Given that the course administrator role requires considerable written communication, it is essential that Vernell continue to improve in this area.

**Technical Knowledge:**

Demonstrates knowledge of Firm procedures and other guidelines related to assigned duties

Demonstrates proficiency in software used by Firm and work team

Demonstrates proficiency in utilization of office equipment

**Comments:**
Vernell demonstrates understanding of the firm and PDC policies and procedures. She is proficient at the desktop tools used by the department. Vernell should spend some time with the DTP group to thoroughly understand the new logo and branding guidelines, and how that may impact our course materials.
Another suggestion is that Vernell should become more familiar with the course content. Although she is not expected to understand the subject matter, she should be familiar with what's in the various documents and files. Then, changes and electronic formats will be well organized and if something doesn't seem right, Vernell can help ensure the quality of the materials.

**Personal Attributes:**

Demonstrates ability to:

Take initiative

Work independently

Adapts well to change (flexible)

Possesses the attributes of reliability and dependability

Displays a cooperative and professional attitude toward:

Firm

Supervisor

Others (work team/staff/clients)

Responds positively to constructive criticism

Presents a strong professional image





Demonstrates consistency in: Attendance

**Comments:**
This area is Vernell's strong point. She demonstrates a strong desire to do a good job, and to be effective in her position. She has a good attitude towards her work and the participants. She also indicates a willingness and desire to improve her skills when given feedback.

During this period, Vernell has "buddied" with Debbie Carter to back each other up. Vernell has worked well with Debbie, and together, they have identified new caterers, and improvements in the course logistics. Vernell has also offered to help out other courses (such as the ascendant rollouts), and her willingness to take on extra tasks is much appreciated.

**Management Skills (for supervisors only):**

Displays the following leadership capabilities:

Supervision 1 2 3 4 5 NA

Delegation 1 2 3 4 5 NA

Motivation 1 2 3 4 5 NA

Counseling 1 2 3 4 5 NA

Develops staff for increased responsibility and promotional opportunities 1 2 3 4 5 NA

Exhibits analytical skills (imagination, creativity)

Plans and coordinates with management and staff

Manages time effectively

**Other Performance Criteria specific to position:**

1. Reviews course expenditures for accuracy. Prepares attendance reports for charges and cancellations.

2.

3.

**Comments:** Vernell has taken over responsibility for this area for MITIS 2, which is a big help to me as the program manager. She completes these tasks in an accurate and timely manner. My only suggestion is that Vernell should verify account codes, and international charges for the frequent changes that occur in the codes and how the charges are handled.

**Overall Commentary on Performance:**



 To: Event Coordinators
cc:
Subject: Processes

**1 file attached**

Here is an example of what Vernell put together for her classes. This is a perfect example of what I am looking for if you want to use the format.

Excellent job Vernell!!

Forwarded by Andrea Raimondo/US/MCS/PwC on 10/10/2001 12:52 PM

Vernell Woods
10/09/2001 12:37 PM

To: Andrea Raimondo/US/MCS/PwC@Americas-US
cc:
Subject: Class Process for DW SAP BW, Intro DW, Bootcamp, Adv. Meth.

**4 files attached**

Instructions Adv Meth.do



#3

Presented to

# Vernell Woods

For providing excellent service while under the "bizarre-est" of situations.

## The Road Runner Award

PRICEWATERHOUSECOOPERS

Amy Wright

Amy Wright, Global Leader
Learning and Professional Development

July 26, 2001



# ACCUMULATIVE VENDOR CLASS STATS
## 2000/2001

| COURSE | DATE | ASCENT | NON-ASCENT | LPDC | TOTAL |
|---|---|---|---|---|---|
| BroadVision | 7/24-7/28 | 0 | 16 | | 16 |
| BroadVision | 8/7-8/11 | 16 | 3 | 2 | 21 |
| ATG | 8/7-8/11 | 11 | 2 | 2 | 15 |
| ATG | 9/1-9/8 | 26 | | | 26 |
| BroadVision | 9/1-9/8 | 36 | | | 36 |
| BroadVision BA | 9/11-9/12 | 0 | 1 | | 1 |
| ATG | 9/11-9/15 | 16 | | | 16 |
| BroadVision | 9/11-9/15 | 20 | 3 | | 23 |
| ATG | 9/25-9/29 | 38 | | 2 | 40 |
| BroadVision | 9/25-9/29 | 25 | 4 | | 29 |
| BroadVision BA | 9/25-9/26 | 0 | 1 | | 1 |
| ATG | 10/9-10/13 | 18 | | 2 | 20 |
| BroadVision | 10/9-10/13 | 15 | 6 | 1 | 22 |
| BroadVision BA | 10/9-10/10 | 0 | 2 | | 2 |
| ATG | 10/23-10/27 | 29 | | 1 | 30 |
| Ariba | 10/23-10/27 | 12 | | 4 | 16 |
| ATG | 11/13-11/17 | 15 | | 2 | 17 |
| BroadVision | 11/13-11/17 | 8 | 3 | | 11 |
| ATG | 11/27-12/1 | 15 | 1 | 6 | 22 |
| Vignette | 11/27-12/1 | 6 | 2 | 1 | 9 |
| Ariba | 11/27-12/1 | 28 | | 4 | 32 |
| ATG | 12/11-12/15 | 25 | | 6 | 31 |
| BroadVision | 12/11-12/15 | 15 | | 2 | 17 |
| BroadVision BA | 12/11-12/12 | 0 | | 1 | 1 |
| i2 | 12/11-12/15 | 24 | 7 | 1 | 32 |
| ATG | 1/8-1/12 | 18 | 2 | 1 | 21 |
| Ariba | 1/8-1/12 | 25 | | 1 | 26 |
| BroadVision | 1/8-1/12 | 8 | 1 | | 9 |
| ATG | 1/22-1/26 | 38 | | | 38 |
| BroadVision | 1/22-1/26 | 25 | | 3 | 28 |
| Vitria | 2/5-2/9 | 10 | 1 | | 11 |
| BroadVision | 2/5-2/9 | 23 | | | 23 |
| ATG | 2/19-2/23 | 16 | 5 | 5 | 26 |
| BroadVision | 2/19-2/23 | 12 | | | 12 |
| Vignette | 2/19-2/23 | 10 | 1 | | 11 |
| ATG | 2/26-3/2 | 14 | 3 | 3 | 20 |
| ATG | 3/26-3/30 | 42 | | 4 | 46 |
| Vignette | 3/26-3/30 | 21 | | 2 | 23 |

| | | | | | |
|---|---|---|---|---|---|
| ATG | 4/02-4/06 | 5 | | 2 | 7 |
| ARIBA | 4/02-4/06 | 9 | | | 9 |
| BroadVision | 4/02-4/06 | 5 | | 1 | 6 |
| ATG | 4/30-5/4 | 10 | | 4 | 14 |
| BroadVision | 4/30-5/4 | 12 | | 2 | 14 |
| ATG | 5/21-5/25 | 53 | | 3 | 56 |
| BroadVision | 5/21-5/25 | 22 | | 1 | 23 |
| ATG | 6/4 - 6/8 | 9 | | | |
| | | **785** | **64** | **69** | **909** |
| Application Developer | 7/10-7/21 | | 29 | 6 | 35 |
| | | | **29** | **6** | **35** |



 10/09/2001 12:57

To: Event Coordinators
cc:
Subject: Processes

**1 file attached**

Here is an example of what Vernell put together for her classes. This is a perfect example of what I am looking for if you want to use the format.

Excellent job Vernell!!

Forwarded by Andrea Raimondo/US/MCS/PwC on 10/10/2001 12:52 PM

Vernell Woods
10/09/2001 12:37 PM

To: Andrea Raimondo/US/MCS/PwC@Americas-US
cc:
Subject: Class Process for DW SAP BW, Intro DW, Bootcamp, Adv. Meth.

**4 files attached**

Instructions Adv Meth.do



**To:**       David Duhamel
**cc:**
**From:**     Vernell Woods
**Date:**     03/31/97 10:42:27 AM
**Subject:**  Request Meeting

Hi Dave,  I would like have a meeting with you to discuss some concerns reqarding myself.

Thanks!

#1

Sheet1 (2)

| | | comp | hr-rate | hrs | amount | total | $/hr | % change | |
|---|---|---|---|---|---|---|---|---|---|
| FY-96 | base | 25000 | 12.50 | 1667 | 20833 | | | | |
| | overtime | | 18.75 | 392 | 7350 | 28183 | 13.69 | | |
| | | | | | | 33820 | | | annualized |
| | | | | | | perf rating 3 | | | |
| FY-97 | base | 27500 | 13.75 (13.23) | 2000 | 27500 | | | | |
| | overtime | | 20.63 | 377 | 7776 | 35276 | 14.84 | 8.42% | |
| | | | | | | perf rating 3 | | | |
| FY-98 | base | 28700 | 14.35 (13.80) | 2000 | 28700 | | | | |
| | overtime | | 21.53 | 300 | 6458 | 35158 | 15.29 | 4.36% | |

Current note: mid-range = 33,900; max = 40,700

TOTAL DOLLARS / TOTAL HOURS

$35,726 / 2377 hrs = $14.8[illegible] effective [illegible]

July + Aug = 49 OT hrs. × 6 = 294 ≈ 300

[90 - 8 NE] Midpt. $33,900 Max. $40,700

[73 - 8 E] Mid pt. $28,100 Max. $52,400

Perf. (3) → 2.5%



**To:**       Vernell Woods
**cc:**
**From:**     David Duhamel(USDomino001)
**Date:**     06/30/97 12:42:30 PM
**Subject:**  Private matter

Please read and delete.

**To:**       Sandra Kinsey
**cc:**
**From:**     David Duhamel
**Date:**     06/30/97 12:40:15 PM
**Subject:**  Vernell Woods

Having waited patiently for me to complete recent teaching commitments, Vernell stopped in to see me today.  She expressed some concerns that I wanted you to be aware of.  She feels that, in spite of her increased role over the past year (now supporting two courses as a CA), that she still has not been promoted to a staff level equal to her peers and that her compensation has suffered for it.  I explained that being a non-exempt was potentially advantagous with overtime pay, and also that we were re-examining the PDQs throughout the organization.  She voiced concern that there was no one to be her advocate.  I told her that Alex had also raised her concerns to me (end of last week).

I don't think that there is much more that I can SAY to her that will have any impact.  Do you recommend any specific actions for me to take?  Also, I think it would help if you can find a few minutes to talk to her at some point when things settle down.  Thanks.

PRICEWATERHOUSECOOPERS

PricewaterhouseCoopers LLP
5104 Eisenhower Boulevard
Tampa FL 33634
Telephone (813) 290 4000
Facsimile (813) 290 4100

March 31, 2000

Ms. Vernell Woods
5104 Eisenhower Blvd.
Tampa, FL 33634

Dear Vernell,

The purpose of this letter is to outline the terms and conditions relevant to an advance of $7,500.00 to be issued to you by PricewaterhouseCoopers on this date. Your signature below affirms your agreement with the stated terms and conditions.

You will be expected to repay the advance with a monthly check to PricewaterhouseCoopers due on the last day of each month starting April 30, 2000. The attached schedule shows the payment due on the last day of each succeeding month, with full repayment scheduled for December 31, 2001.

You are encouraged to make additional or larger payments to repay the loan sooner.

If you should voluntarily leave the firm prior to complete repayment or be dismissed for cause, you will be responsible for paying the remaining balance at the time of your departure. Failure to do so will result in a reduction in your final paycheck.

If you should be involuntarily separated for reasons other than misconduct prior to December 2001, the amount you owe will be reduced by $300 for each month between your separation date and December 31, 2001. For example, if laid off on May 15, 2001, the repayment amount would be reduced by 8 months (May thru December) or by $2,400.

Please understand that this arrangement is unusual and not an entitlement of your employment, but rather a humanitarian gesture by the organization in view of your special need. Your care in adhering to the terms and conditions is both expected and appreciated.

Sincerely,

David P. Duhamel

David P. Duhamel
Director of Operations
Learning & Professional Development Center

I agree to these terms and conditions....Vernell Woods.....................................

| | Payment Due | Balance |
|---|---|---|
| 31-Mar-00 | | 7500 |
| 30-Apr-00 | 300 | 7200 |
| 31-May-00 | 300 | 6900 |
| 30-Jun-00 | 300 | 6600 |
| 31-Jul-00 | 350 | 6250 |
| 31-Aug-00 | 350 | 5900 |
| 30-Sep-00 | 350 | 5550 |
| 31-Oct-00 | 350 | 5200 |
| 30-Nov-00 | 350 | 4850 |
| 31-Dec-00 | 350 | 4500 |
| 31-Jan-01 | 350 | 4150 |
| 28-Feb-01 | 350 | 3800 |
| 31-Mar-01 | 350 | 3450 |
| 30-Apr-01 | 350 | 3100 |
| 31-May-01 | 350 | 2750 |
| 30-Jun-01 | 350 | 2400 |
| 31-Jul-01 | 400 | 2000 |
| 31-Aug-01 | 400 | 1600 |
| 30-Sep-01 | 400 | 1200 |
| 31-Oct-01 | 400 | 800 |
| 30-Nov-01 | 400 | 400 |
| 31-Dec-01 | 400 | 0 |

(1) $7,500 in travelers checks issued on 3/31/2000

(2) monthly payments to petty cash due at the end of each month in amounts shown

(3) advance payments encouraged

(4) if voluntarily separated, full balance due on last day of employment; if involuntary separated, balance due reduced by $300 for each month counting back from December2001

DPD 3/31/00





**BONNIE A. BERNS, P.A., A ATTORNEY**
2185 Logan Street
Clearwater, Florida 33765
(727) 443-2331

0084

DATE 10/29/01

RECEIVED FROM Vernell Woods $ 100 00

One Hundred DOLLARS

FOR Legal Consultation

☐ CASH
☒ CHECK 1727
☐ M O

BY [illegible]

Thank You

| AMOUNT OF ACCOUNT | 100 | — |
|---|---|---|
| THIS PAYMENT | 100 | — |
| BALANCE DUE | 0 | — |

---

No. ______ 5/2 2000

Received from Vernell Woods

Three Hundred & 00/100 Dollars

$7500.00

− 300.00

New Bal $7200.00

$ 7200.00

E Carole Perkins

WilsonJones • Carbonless S1731 CL Duplicate

© WilsonJones, 1989

---

No. ______ 5/31 2000

Received from Vernell Woods

Three Hundred & 00/100 Dollars

7200
− 300
6900 Bal

$ 300.00

E Carole Perkins

© WilsonJones 1989

WilsonJones • Carbonless S1731-CL Duplicate



#12

EVENT COORDINATORS – PROGRAM and MANAGERS
1989
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
2000
2001
Lynn Forest
Program
Cindy Minetti
ASCENT
Debbie Eichler
Not in LPDC
Program
Vernell Woods
Text &
Terry McGhee
Graphic Conv.
Trish Sward
Secretary/
Accounting
Trish Sward/
Kevin Young
MITIS 3
Teri Ponsot
Henry Lum
Program
Products
Kevin Young
Program
Finance
Carole Perkins
Program
John Patry
Trish Sward
Cindy Minetti
MITIS 2
Data
Secretary
Melinda Zielinsk
Larry Gosselin
Warehousing
Cindy Minetti
MITIS 2
Lynn Cummins
David Duhamel
Leading Team
MITIS 3
Rob Hay
Simon Marlow
Alex Zielinski
Paul Neary
Joe O'Connor
Bill Boyd
Alain de Delva
David
Duhamel
Accounting
Lynne Cummins
Program
Leading
Team
Broadvision
ATG, Vingette,
I2, ARIBA,
Application Dev
Data
Warehousing
Kevin Lloyd
Carl Kozlevcar
Larry Gosselin
Christian Dick
Andrea Raimondo
Andrea Raimondo
Andrea Raimondc
Andrea Raimondo



ARGIL SHOCK/The News-Sentinel

›ods used her loan through the Near Southeast Revolving Loan uy 11 computers and open the computer training school she ›d for and dreamed about for years. "The demand is there," she said. "A lot of people are going into programming, leaving the people who just want to use computers." The $28,000 loan is to be repaid in five years.

mand is there," she said. people are getting into ng, leaving the people ant to use computers."

path to business owner- not been an easy one, kes receiving the low- n especially important.

n a struggle," she said. hard. I don't downplay ve just got to make up you're going to meet ou just have to encour- f. You just have to stick

interested in computers she started using them.

ing I did in college was elated," she said. "The ts and you just live it es into focus, especially female, black and rais- full of children."

ds' six children, five into engineering, giving ther aspect of computer to dream about adding ol's curriculum. Woods daughter, a mechanical rking in robotics, can once a week to teach a sisted design class, for

for the loans has

UTHEAST

waned, Carswell said. Woods' loan is one of the few opened this year.

"From 1983 through late 1986 people were just in all the time," Carswell said, "but times have changed. The interest rates were high and banks were keeping money tight, and we were able to do more than we have in the last year and a half."

Carswell and city economic development officials in charge of her program believe the pace slowed because the needs of southeast businesses are changing, too.

They are studying changes they can make in the program to more effectively meet those needs.

"We're looking at ways we can help the businesses which are talking about starting," Carswell said, "especially the people without any business background.

"And we want to make it easier for the small businesses already in business by providing technical assistance, for example, for businesses which may not retain an accountant or have an up-to-date accounting system."

The program is also a victim of its own success.

"Most of the businesses in the area have utilized the funding and have two or three more years to pay off," Carswell said. That situation has opened another avenue of service to consider.

"They are wanting to replenish their supplies on a large level but don't have the business volume to do it. It's kind of a Catch-22.

"They've already utilized the fund, and we don't want to pile another loan on them, but there are businesses which are going and need to get bigger or just need to keep going at the same level. They need $5,000 to $10,000 and may not be creating any more jobs."

Officials expect to have the program reorganized sometime this year, Carswell said, and once they do, they've set a goal of marketing it more aggressively to make sure the business people know it's here to help them.

## Revolving Loan Fund

The Near Southeast Revolving Loan Fund is one of two low-interest loan funds administered by the city's non-profit Near Southeast Development Corp. Here are the loan criteria:

**Eligible uses:** Equipment, inventory and working capital.

**Loan limits:** $1,000 to $25,000.

**Job creation:** Preferred but negotiated according to the borrower's needs.

**Program boundaries:** Southeast Fort Wayne.

**Percentage contributions:** One-third to one-half of the project costs must be funded by the business owner.

**Interest rates:** Three percent to 7.5 percent but most often 5 percent. Never higher than the prime rate.

**Eligible businesses:** Any business located in Southeast Fort Wayne.

*Source: Fort Wayne Division of Economic Development*

# summit city report

## ıting of South Africa legislation

Charles Redd

ı sole suppliers doing business h South Africa, but requires the troller to submit to the mayor a ten statement explaining why ds must be purchased from that ıce

esponding to an informal in- ry during recent budget talks, ld said city finance director David olletto told him he didn't believe city currently was doing business ı any financial institution with th African ties.

he city recently hired an internal itor who, in addition to having er duties, is expected to be as- ed to monitor compliance with South African legislation, accor- g to Redd. He said he intends to e the administration time to get a person properly oriented before ing for written documentation to ermine if the city is in compliance City Public Information Officer Caroline Brewer said the Community Development and Planning compliance officer currently monitors all city construction and purchasing contracts to ensure construction companies and vendors adhere to the city statute.

Redd said he drafted the ordinance to put himself and other sympathetic council persons on record as opposing the racist apartheid regime of South Africa's P. W. Botha. The situation in South Africa parallels that of slavery in this country, according to Redd. "I could not see us (city government) contributing to that system," he said.

The U.S. House of Representatives recently passed similar measures prohibiting American businesses from investing in South African firms. The measure isn't expected to pass the Senate. If it does, it probably will face a presidential veto.

Rep. Dan Coats (R-Ind., 4th District) supported a 1986 Congressional bill enacting sanctions against South Africa, but voted against the recently passed bill sponsored by Rep. Ron Dellums (D-Calif.) to toughen those restrictions. Instead, Coats supported fellow Indiana Republican Rep. Dan Burton's failed amendment to require U.S. companies operating in South Africa to set aside money for black economic development in that country.

Fort Wayne's South Africa legislation has been in effect since December 23rd, 1985. Council members Janet Bradbury, Benjamin Eisbart, Mark GiaQuinta, Thomas Henry, Redd, James Stier and Sam Talarico voted for the local measure. Donald Schmidt voted against it and Paul Mie Burns abstained.

Vernell Woods, owner/operator of Computer Institute.

## City worker to open computer institute

by OMOWALE-KETU OLADUWA
Staff Writer

Computers are showing up everywhere — from the welfare office to the corporate board room — and people who are serious about employment in the 21st century are boning up on their computer skills.

The pressure to be afloat in the mainstream of the information flow as society enters the 21st century has pushed a 44-year-old city employee to start a computer school that will quickly and efficiently teach beginners computer basics.

Vernell Woods has worked nine years for the city of Fort Wayne in computer-related positions; has an associate's degree from Indiana University, and 123 credits in supervision toward a bachelor's degree from Purdue University.

But life hasn't always been so promising for Woods.

Twenty years ago, she was a 24-year-old single mother on welfare. But even then she described herself as an "achiever."

"Any time you were too embarrassed to go into the welfare office I figured you really didn't need what you were being forced by conditions to ask for, Woods said. "I always was an achiever and never lost sight of my goals." Her interest in computers developed from her own curiosity through to next month's opening of Computer Institute, 1117 S. Clinton St.

"The institute will service individuals who want to acquire technical skills in computer functions but are not immediately interested in acquiring a degree," said Woods. She will instruct students in word processing, data base, spreadsheet and other pre-packaged programs. "They'll be able to compose, edit and do basic word processing functions. In addition, they'll learn proper keyboarding."

What preparation did Woods require to open her institute? "During college I did a lot of marketing research, and I also set up and wrote a manual to teach the use of the computer," Woods said. "The demand for computer training was one of the top five occupational areas involving the computer," she said.

Woods said setting up the institute has cost her roughly $15,000, with start-up costs approximating one-third of that total. A three-week session at the Computer Institute will cost $1[illegible], and [illegible] classes are already committed and scheduled to begin Sept. 13th, according to Woods. Although the institute is a long-held dream of Woods', she won't be [illegible]ing her city job in the near future, she said. First, she said, she painstakingly will build the institute into a profi[illegible]

## ꜱchool's in

mark on the calendar. It's a change attitudes, a change in feelings. I guess being back to school isn't all that bad; still, it's kind of sad to see the summer end. I was just getting good at it.

[illegible]uth Side High School cheerleader Dawn Rugge struts her schools colors at the

# lutes the Class of 1996

## nother raises six college graduates on her own

ods (front, right) with her children Francine, Bridgette, Cassandra, Hegwood, Bobbi Renee Datcher and Theresa Cotton.

received an Associates Christian Counseling and ier own full service salon Fla.; Brigette Woods, 34, a BS in Mechanical ng Technology from iiversity, West Lafayette w a senior Engineer at Engines in Columbia City; Woods, 32, now works as health physicist for the US it after receiving a degree try from Norfolk State , Va.; Bobbi Joe Hegwood, d a degree in Computers rical Engineering from iiversity, West Lafayette, v a software engineer for Engines.

gh Vernell Woods once velfare to make ends meet, he found reliance on "the wered her self-respect. ne you're ashamed to be on welfare, you're ready to get off welfare," she said. Woods received her GED in the mid-70s, and worked as a secretary for Mayor Ivan Lebamoff. While working for city government, Woods began to learn about computer technology, and worked as a data development specialist during the administrations of mayors Winfield Moses Jr., and Paul Helmke, then opened her own training school, the Computer Institute, in 1988.

"Our mother could probably be a millionaire without all these kids," Bobbi Renee Datcher said. Using scholarships, grants, student loans, and even money borrowed from their church, the Woods' family matriarch made certain each of her children received the education they needed to become self-sufficient. She also insured her children led "God-centered" lives. "It was always God first, and then education," Theresa Woods remembered.

"I led by example, and let each my children know at an early age that they were loved," Vernell Woods said. "We were poor, but my children never knew they were poor. If you're rich you can do anything you want to do, and my kids all had whatever they needed to succeed."

Along the way, Vernell received her own Associates degree in business from IPFW in 1978, and is only 8 credit hours away from receiving her Bachelors degree. However, after moving to Tampa, Fla., Woods has thus far been unable to complete that degree. "We all harass her severely about not graduating," daughter Cassandra

's Program

igh school;
least 2.0 on a 4.0 scale;
r commit a crime;
sity, or technical school as a

senior year in high school.

Century
es

d Success!

## Joeffrey transformed self at Dwenger

PHILIPPE ALAIN JOEFFRY JR.

During his freshman year at Bishop Dwenger High School, Philippe Alain Joeffrey Jr., maintained an underwhelming grade point average of 4.0 on a 12 point scale and had fallen in with "the wrong crowd." He was seen as a troublemaker, had a quick temper, and many teachers were intimidated by his then-6'2", 315 pound frame.

Joeffrey got a "wake-up call" when a student he had beaten up for calling him a "nigger" overheard Joeffrey arranging the sale of a knife. The student went to school administrators. Joeffrey was suspended and expulsion seemed likely.

"Most teachers didn't want me," Joeffrey recalls of the period. It was only through the intervention of Dr. J. Fred Tone, the school's principal, that Joeffrey was given one more chance to prove himself.

"Who wants to graduate high school with nothing accomplished?" Joeffrey asked himself, and decided to change his priorities. For his success at Dwenger, Joeffrey credits his Haitian father Philippe Alain Joeffrey Sr., with giving him his sense of discipline; his Haitian mother Yanick Joeffrey with providing him with a love of art, music, and poetry; Dr. Tone for "being on my back when dad wasn't;" and Jimmy Goeglein — "a puny dude, actually" — with being the one fellow student who wasn't afraid to tell him "you're screwing up."

This year, with a 9.6 grade point average, Joeffrey will graduate as the only Afrikan American honor student in Dwenger's class of 1996.

Even though Joeffrey knows his father, an engineer at General Electric, would be willing to pay his son's high school tuition, the younger Joeffrey has insisted on paying it himself. Each morning he rises at 3 a.m. to deliver about 400 newspapers throughout Arlington Park ("The first time I noticed how big I am was when I tried to collect money from my customers and people wouldn't open the door for me," said Joeffrey, who now stands 6'7".), works at Burger King, and hopes to be licensed to umpire high school and minor league baseball games this summer.

Joeffrey also intends to avoid asking his parents to pay his tuition at IU Bloomington, where he also hopes to qualify for honor classes.

"If you qualify for honors, you can start out as a business major," he said. "I don't want any 'fluffy' classes; I want the real deal."

## Rowe to enter US Army July 18

Although Stephen Rowe is one of only two Afrikan Americans in his class at New Haven High School, he said race relations at this school are superior to those at Heritage High School, where he had been going until the eighth grade.

"People here realize what's going on," he said of New Haven.

At Heritage, he said, "People are afraid of other cultures," and Afrikan American students were disciplined more often and more severely than other students. Once, he said, a teacher had a video camera set up in class to monitor students, but the camera was pointed directly at him. "I felt like I was on America's most wanted," he said.

In addition to his own difficulties at Heritage, the son of Tarrinna and Paul Rowe said his generation faces the challenges of drugs, AIDS, and violence.

"Everybody gotta hold a gun. It seems like it's a new toy to everybody," said Rowe, who said he had lost five friends to violence.

In school, Rowe's interests were drafting, art, and football. After graduation, he will enter the US Army July 18. With three years of active duty as a cannon fire direction specialist, he plans to use his GI Bill benefits to attend college.

### Exempt/Nonexempt Status

The Fair Labor Standards Act (FLSA) classifies positions as exempt or nonexempt depending on job content—not title, salary, or grade. By law, job content of positions must meet certain FLSA tests to be categorized as exempt.

Put simply, the law excuses businesses from the requirement to pay overtime for positions classified as exempt. To determine whether a position should be classified as exempt or nonexempt, a FLSA questionnaire addressing these tests is completed. National Human Resources in New York reviews the questionnaire and advises NAC of the correct status.

These are the practice support exempt staff classifications used at NAC:

| Code | Classification |
|---|---|
| 24 | Managing Director/Director |
| 33 | Associate Director/Manager |
| 71 | Sr. Associate |
| 72 | Sr. Associate/Associate *(Part-time)* |
| 73 | Sr. Associate/Associate |

These are the practice support nonexempt staff classifications used at NAC:

| Code | Classification |
|---|---|
| 83 | Secretary |
| 90 | Office Staff |
| 92 | Office Staff *(Part-time)* |



/24/95

Price Waterhouse
ALPHABETIC EMPLOYEE NAME LIST
Department: 902 Location: 810

| NAME | EMP# | TITLE | DIVISION, DEPARTMENT |
|---|---|---|---|
| Andrews, Mark R | 34714 | Intern | 800, 902 |
| Birch, Paul D | 01185 | Principal Consult | 800, 902 |
| ~~Bower, Kenneth J~~ | ~~27397~~ | ~~Consultant~~ | ~~800, 902~~ |
| Boyd, William J | 08839 | Principal Consult | 800, 902 |
| Breed, Mona C | 00969 | Principal Consult | 800, 902 |
| Burkhard, Donald L | 06239 | Principal Consult | 800, 902 |
| Coady, Margaret M | 34484 | Consultant | 800, 902 |
| Crawford, Donald D | 06263 | Sr. Associate | 800, 902 |
| Crim, Alan L | 33096 | Sr. Associate | 800, 902 |
| de Delva, Alain | 20454 | Principal Consult | 800, 902 |
| Dickson, III, John C | 26757 | Consultant | 800, 902 |
| Duffy, Maryann | 23888 | Principal Consult | 800, 902 |
| Elliott, Constance S | 04554 | Associate | 800, 902 |
| Estopare, Matthew J | 11203 | Consultant | 800, 902 |
| Forest, Lynn A | 04087 | Associate | 800, 902 |
| Han, Peter | 34717 | Intern | 800, 902 |
| Johnson, Cory M | 42676 | Principal Consult | 800, 902 |
| Kemerer, Karen A | 45405 | Principal Consult | 800, 902 |
| Kinsey, Sandra S | 84790 | Manag Dir Grd 17 | 800, 902 |
| Kozlevcar, Carl J | 47769 | Principal Consult | 800, 902 |
| Lima, Dean | 35146 | Consultant | 800, 902 |
| Lovelock, Julian E | 28618 | Consultant | 800, 902 |
| ~~Lu, Jun~~ | ~~30791~~ | ~~Foreign Exchange~~ | ~~800, 902~~ |
| Mabie, Edward W | 53148 | Principal Consult | 800, 902 |
| Macesich, Kathryn J | 97695 | Principal Consult | 800, 902 |
| Magee, Terence J | 53707 | Director | 800, 902 |
| McMenimon, Tracy A | 17194 | Consultant | 800, 902 |
| Meiller, Celso | 20635 | Foreign Exchange | 800, 902 |
| Minetti, Cynthia S | 85856 | Principal Consult | 800, 902 |
| Minetti, Jr., Anthony C | 04171 | Principal Consult | 800, 902 |
| O'Connor, Joseph | 65437 | Principal Consult | 800, 902 |
| O'Loughlin, Anne | 65986 | Principal Consult | 800, 902 |
| Oeltjen, Sarah D | 21094 | Consultant | 800, 902 |
| Olpinski, Diane M | 20768 | Associate | 800, 902 |
| Patry, John R | 21345 | Principal Consult | 800, 902 |
| Pittman, Charles A | 32198 | Consultant | 800, 902 |
| Ploch, Richard A | 70334 | Associate | 800, 902 |
| Ponsot, Teri M | 35340 | Associate | 800, 902 |
| Redfield, Jeffrey J | 73144 | Principal Consult | 800, 902 |
| Reishman, John B | 32450 | Intern | 800, 902 |
| Rose, Natasha | 27396 | Consultant | 800, 902 |
| Salthouse, John M | 28269 | Principal Consult | 800, 902 |
| Silvafilho, Jose J | 26756 | Foreign Exchange | 800, 902 |
| Sward, Patricia D | 88035 | Associate | 800, 902 |
| Tennant, Randall W | 26054 | Consultant | 800, 902 |
| Thomson, James I | 13718 | Principal Consult | 800, 902 |
| Trayner, Nancie K | 24791 | Secretary | 800, 902 |
| Weller, Julie C | 34605 | Consultant | 800, 902 |
| Winsey, Paul M | 24216 | Sr. Associate | 800, 902 |
| Woods, Vernell | 34260 | NonExempt PSOP | 800, 902 |
| Woodworth, Eric F | 26758 | Consultant | 800, 902 |
| Young, Kevin W | 99547 | Principal Consult | 800, 902 |
| [illegible] | | | |

10/24/95 Price Waterhouse Page 2

ALPHABETIC EMPLOYEE NAME LIST

Department: 902 Location: 810

| NAME | EMP# | TITLE | DIVISION, DEPARTMENT |
|---|---|---|---|

Total Employees: 52

#16

# ent Coordination and Self Paced Learning Group

David Duhamel
(Global Operations Leader)

Andrea Raimondo

Jackie Walters
(BUD)

| onda Massingill (Lead) **Strategy** **Additional Mgt** **Admin** | Debbie Eichler (Lead) **Data Warehousing** **SPL Team:** Linda Anderson, Diane Olpinski, Lori Yenkala; Desiree Howard **Compliance** | Wendy Citrenbaum (Lead) **CRMS**; Colleen Walsh **SCOS/iAnalytics**; Yolanda Diaz **HCS/PeopleSoft** | Lynn Forest (Lead) Lydia Garcia, Andrew Breuer, Sumi Ham **ASCENT** | Vernell Woods (Lead) Josette Clark-Johnson **Vendor/ Infrastructure** | Rossi Ramos (Lead) **NWN/ITI Vendor**; Frances Phillips **NWN** | Teri Ponsot (Lead) Leah Brown **Training & Development**; Cynthis Harris **MBO/New Joiner** | Melinda Sasxon (Lead) Mary Larkin, Tani Arden **PPM**; Karen Duvall **Industry/Oracle** |
|---|---|---|---|---|---|---|---|



#17

**To:** Kevin W. Young
**cc:**
**From:** Kevin W. Young
**Date:** 05/30/96 10:45:57 AM
**Subject:** Performance Evaluation for Vernell

# *Performance Evaluation*

**Comments:**

Vernell has taken her responsibilities seriously, has applied herself in learning new technologies and understanding the objectives and implications of her activities. She is extremely diligent and always maintains a positive attitude. Based on a track record of thoroughness, accuracy and quality, I have come to rely on Vernell to get the job done.

Please see accountabilities section for specific performance results.

Vernell's overall rating for this period is "Higher than Expected".

## SECTION I: Identification Information

### A. Identification

1. Job Title: **Program Administrator**
2. Last Name: **Woods**
3. First Name: **Vernell**
4. Staff Number: **34260**
5. Reports to (Name): **Kevin W. Young**
6. Reports to (Title): **Principal Consultant, Methodology Development**
7. Supervisor Staff #: **99547**
8. Today's Date: **05/30/96**
9. Office Number: **800**
10. Office Name: **National**
11. Region **National - Professional Development Center**
12. Work location name and number (if different from 8 and 9 above): **810**
13. Service Line and/or Industry Line
    **Practice Support**
14. Primary Job Functional Area

    **Human Resources - Training**

### B. Job Scope

The focus of this job is at the following level:
(Please indicate percentage of time spent on each scope).

**Office** **25**

| 1 | 15 | Confirm participant registrations for the MITIS 3 program and track registration dynamics. | **Expectations:**<br><br>*Ensure the accuracy and availability of class enrollment information to support program/department management.*<br><br>In this activity Vernell must compose a memo to registrants of each class that solicits positive confirmation of their plan to attend. It is critical that the dates and other particulars communicated to registrants be clear, concise and accurate. It is also critical that this memo be issued within three weeks of the class start date.<br><br>**Results:**<br><br>Vernell did an admiral job with attendance confirmation and tracking. She quickly became proficient in using a combination of Lotus Notes, CERIS and Excel to confirm registrations, monitor registration changes and return receipts, maintain registration details, and cancel registrations (on notice of cancellation from registrants).<br><br>Vernell has been diligent in this effort has produced high-quality results. I have been very pleased with her work.<br><br>**Rating:**<br><br>Higher than expected (based on overcoming the learning curve associated with taking on this position and on my previous experiences with veteran course administrators)<br><br>**Suggestions for Improvement:**<br><br>Look for ways to improve the efficiency of this process, while still meeting the objectives. For example, allocate some time each day to process the confirmations, open Notes, CERIS and Excel windows, and sequentially work through the day's receipts. Then move the receipts to a Notes category set up for the class. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 2 | 10 | Communicate joining instructions, class cancellation notices, and pre-course reading material to registrants and track receipt confirmations. | Expectations:<br><br>*Ensure that registrants are informed of class particulars and are in receipt of pre-arrival and pre-course reading materials.*<br><br>On positive confirmation of a registrant's plan to attend Vernell must issue joining instructions and pre-course reading to the registrant. This information must be issued as soon as practicable after confirmation and must contain accurate details regarding transportation, accommodation and class particulars. Vernell is expected to compose the joining instructions for my review and, then to issue the joining instructions via Lotus Notes with return receipt requested. She then must track the receipts and follow-up with the regional MCS CE contacts to ensure that participants are in physical receipt of the joining instructions and pre-course reading prior to their arrival in Tampa.<br><br>Results:<br><br>Again, Vernell's diligence and attention to detail earned my trust in her ability to manage this process with little supervision and follow-up on my part. She understands the objectives and their importance and can be counted on to make it happen.<br><br>Rating:<br><br>Higher than expected<br><br>Suggestions for Improvement:<br><br>Essentially same as previous accountability ... seek out efficiencies in this process. Make sure that the Excel spreadsheet is kept current on Pre-Arrival Information receipts. |

| 3 | 35 | Coordinate and participate in course material publication and logistics including: desktop publishing, printshop production, scheduling, assembly and quality control. | **Expectations:**<br><br>*Provide quality course material for the MITIS 3 class.*<br><br>**Results:**<br><br>Vernell made it her mission to fully understand the organization and content of both the electronic and hard-copy versions of the courseware for MITIS 3. She coordinated the activities of the temporary desktop publishing staff in the conversion of the courseware from WordPerfect/COREL to Microsoft PowerPoint.<br><br>I can count on Vernell to properly apply maintenance changes to the materials and to ensure that materials are ready and available for each class.<br><br>**Rating:**<br><br>Higher than expected<br><br>**Suggestions for Improvement:**<br><br>None noted |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 4 | 15 | **Organize classroom and participant workstation space, daily catering, class dinners, equipment and supplies.** | **Expectations:**<br><br>***Ensure that all facilities, food service, equipment and supplies are in place for class instruction and participation.***<br><br>**Results:**<br><br>**Vernell's diligence in this area was outstanding. She makes sure that all the instructor and participants have to do is show up. She makes sure the classroom and equipment is clean, that all necessary equipment, supplies and materials are in place, that catering is organized and monitored and that arrangements are in place for the graduation dinner.**<br><br>**Rating:**<br><br>**Exceptional**<br><br>**Suggestions for improvement:**<br><br>**Be sure to follow-up with the caterer on clean up of the Wednesday lunches.** |

| | | | |
|---|---|---|---|
| 5 | 15 | Assist department financial administrator with invoice and time and expense report processing.<br><br>Verify of posted MITIS 3 financial transactions against source documents. | **Expectations:**<br><br>*Ensure timely payment to vendors and accurate posting of charges to program and departmental accounts.*<br><br>**Results:**<br><br>Vernell researches and verifies charges posted to the MITIS 3 accounts and advises me of discrepancies and issues. Again, Vernell has earned my confidence.<br><br>Per Trish Sward, Vernell is still in training with respect to invoice and T&E processesing, but performs her tasks in a timely manner and seeks assistance/directions where appropriate. Trish plans to add debit advice processing to her responsibilities for next year.<br><br>**Rating:**<br><br>Higher than expected (MITIS 3)<br>Fully as expected (Trish Sward) |
| 6 | 10 | General administrative support for other program managers, instructors, and administrators. | |

| | |
|---|---|
| National | 70 |
| Regional | 0 |
| Cluster | 0 |
| International | 5 |

If more than one focus was indicated, please explain

**Jobholder is required to confirm and coordinate course registration of U.S. and international professional staff. Jobholder must ensure that all confirmed participants are registered in the Continuing Education Registration and Information System (CERIS), and must cancel registrations on behalf of participants unable to attend.**

## SECTION II: Position Overview

**A. JOB PURPOSE**: Summarize in one sentence the main purpose of this job. (What is this job expected to accomplish?)

**Ensure the availability and quality of the facilities, course materials, equipment, supplies, catering and overall class support for the MITIS 3 System Analysis program.**

**B. PRIMARY ACCOUNTABILITIES:** List 4-6 principal accountabilities in single sentences which are critical to satisfying the position purpose noted above. Note the percent of times spent on each activity; consolidate activities which represent less than 5-10% of total time. The total should equal 100%. Focus on outputs or end results while considering relevant activities or processes. References should be made to the focus (see Question "C" of Section I) of each accountability.

| | % Time | Major Activities (What Does The Position Do) | End Results Expected (Why is it Done) |
|---|---|---|---|
| | | **Example:** *Schedule audit seniors to engagements* | **Example:** *To maximize client service, provide development opportunities, and ensure efficient use of audit staff.* |



October 5, 2001


Amy Wright
PwC Consulting
US Theatre Leader

Hello Amy,

I have not had the opportunity to speak with you personally, however I hope this letter gives you some insight of how I feel about the latest event (PwC promotions) without malice but in sincere congratulations to all those in whom the honour was bestowed.

I have seen people come and go, some with no experience, and no education other than a high school diploma, and with very little computer skills.  Some of these people I have had to train with no recognition of this accomplishment.

I have worked very hard these last nine years here in Price Waterhouse now PwC Consulting, in a job that I have enjoyed doing which presented many challenging and personal rewards.  I have been proactive to learn, educate myself and upgrade my skills that would benefit and have benefited the PwC Consulting initiative.

I have been proactive to complete in a very timely and excellent manner all jobs, and position that was assigned to me.

I have worked countless hours to insure that my position as an Event Coordinator and all related assignments were completed with excellence.

I have taken the initiative in problem solving, when crisis were presented.

I have met every the challenge of the jobs that was presented to me, yet without recognition, salary, promotion nor reward,

I have had to work more hours and receive less pay only to be told that I do excellent work and deserve a one rating (one rating equals 1 for above rating on the PA assements) just to be told the person giving the evaluation "forte" that he doesn't give ones.

I have had many program managers that attest to my progress to where I am today, but the above mentioned has been all eluded to me, as they go on to greater promotions.

When will there be freedom and equality for people, such as myself, where a man/woman is given the opportunity to realize their potential, goals, regardless of their race, colour or creed.  Is not this the "American Dream" that we all strive for. This will not only be victory for oneself but an accomplishment for PwC Consulting and its initiative.

Sincerely,

Vernell Woods
Event Coordinator
PwC Consulting
Tampa Florida